IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE

CENTRAL STATES, SOUTHEAST AND )
SOUTHWEST AREAS PENSION FUND, )
and HOWARD McDOUGALL, trustee, )
 )
 )  Case No. 3:07-0383
          Plaintiffs, )
 )  Honorable Aleta A. Trauger
          v. )  District Judge
 )
INTERNATIONAL COMFORT PRODUCTS, )  Magistrate Judge Brown
LLC, a Delaware limited liability company, )
 )
          Defendant. )

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF
THEIR MOTION FOR SUMMARY JUDGMENT**

**I.    INTRODUCTION**

Plaintiffs Central States, Southeast and Southwest Areas Pension Fund and Howard McDougall, trustee (collectively the "Pension Fund") brought this action against the Defendant International Comfort Products, LLC, a Delaware limited liability company ("ICP")[1] for collection of withdrawal liability, interest, and penalties incurred as a result of a withdrawal from a multiemployer pension plan pursuant to Employee Retirement Income Security Act of 1974 ("ERISA"), as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. § § 1001-1461.

During all relevant times, ICP and Top Transportation ("Top") were subject to an agreement whereby Top agreed to provide certain payroll processing and payroll administration functions with respect to truck drivers employed at ICP (hereinafter referred

---

[1]    During the relevant periods, ICP had various prior or predecessor names which are not relevant to this litigation. For convenience, only ICP is used.

to as the "ICP Agreement"). The truck drivers were subject to collective bargaining agreements executed with Local Union No. 327 of the International Brotherhood of Teamsters ("Local 327") which required pension contributions to the Pension Fund on behalf of the truck drivers. On March 2, 2002, ICP and Top permanently ceased participation in the Pension Fund and as a result incurred withdrawal liability to the Pension Fund in the principal amount of $570,694.55.[2]

ICP is liable for the withdrawal liability owed to the Pension Fund as an employer, pursuant to ERISA and MPPAA because, as a joint employer with Top, ICP had a duty to submit contributions to the Pension Fund pursuant to applicable labor law, 29 U.S.C. § 1392(a). Further pursuant to the ICP Agreement, ICP was required to indemnify Top for the withdrawal liability owed to the Pension Fund. Finally under the federal common law claims of the doctrine of equitable assignment and the Pension Fund was an intended third party beneficiary of the ICP Agreement. This Court has jurisdiction over these claims under Sections 502(e), 502(f), and 4301(c) of ERISA, 29 U.S.C. §§ 1132(e), 1132(f) and 1451(c), as well as under 28 U.S.C. §§ 1331, 1337, 1364. (Stmt ¶¶ 1-5).

## II. STATEMENT OF FACTS

The Pension Fund is a not-for-profit "multiemployer pension plan" within the meaning of Section 3(37) of the ERISA, 29 U.S.C. §1002(37). (Stmt ¶¶ 6-10). The Pension Fund is primarily funded by contributions remitted by multiple participating employers who contribute to the Pension Fund pursuant to collective bargaining

---

[2] The withdrawal liability assessment was in the amount of $570,694.55. The Pension Fund received one payment in the principal amount of $12,195.20, thus, the remaining withdrawal liability due is $558,499.35. (¶¶ 159, 164-165 of Plaintiff's Statement of Material Facts as to which There is No Genuine Issue, which is being filed contemporaneously herewith and which shall be hereinafter referred to as "Stmt ¶__").

agreements. (Stmt ¶ 10). All principal and income from such contributions and investments thereof are held and used for the exclusive purpose of providing pension benefits to participants and beneficiaries of the Pension Fund and paying the Pension Fund's administrative expenses. (Stmt ¶ 10).

For all relevant periods, ICP had a manufacturing plant in Lewisburg, Tennessee. (Stmt ¶¶ 4, 11-12, 64-69). Prior to 2003, ICP manufactured heating and cooling products (commonly referred to as HVAC equipment) for distribution throughout the United States.[3] (Stmt ¶¶ 4, 11-12, 64-70). Top was an Illinois corporation and had its office in suburban Chicago, Illinois. (Stmt ¶¶ 13-14, 61). Top was a professional employer organization that entered into co-employment relationships with clients to provide payroll services, employee benefit services, and related human resource and administrative services. (Stmt ¶¶ 14, 16, 141-146). Local 327 is a labor organization which represented, for the purpose of collective bargaining, the drivers working at ICP. (Stmt ¶¶ 15, 17, 27-33).

ICP was Top's only client that had union members which required contributions to the Pension Fund.[4] (Stmt ¶¶ 16-18, 146). The withdrawal liability at issue involves only the Collective Bargaining Agreements with Local 327. (Stmt ¶¶ 18, 27-31, 146). The relationship between ICP and Top began in 1971. (Stmt ¶¶ 16, 19-15, 39-44). The ICP Agreement was a cost-plus contract with respect to the drivers working at ICP. (Stmt ¶¶ 45-49). Pursuant to the ICP Agreement, ICP was responsible for all costs plus an

---

[3] In 2003, ICP closed the manufacturing plant laying-off approximately 2000 employees and currently only has a warehouse distribution center in Lewisburg. (Stmt ¶ 70).

[4] From 1995-2001, Top's only other client was Hamilton Sunstrand. Top provided about 6-10 non-union drivers who were not subject to any collective bargaining agreements and contributions were not submitted to the Pension Fund on behalf of these drivers. (Stmt ¶ 146).

administrative fee for truck drivers and Top provided payroll and administrative services related to the drivers. (Stmt ¶¶ 16-25, 45-49, 141-145). ICP maintained records of the hours worked by the drivers and forwarded this information to Top. (Stmt ¶¶ 50-51). Top calculated the drivers gross pay and made the appropriate payroll deductions and sent the drivers' pay checks to ICP for distribution to the drivers. (Stmt ¶¶ 52-53). Top invoiced ICP for all costs related to the drivers and after receipt of payment from ICP, Top paid the vendor for the related cost. (Stmt ¶¶ 47-49, 57). Until ICP was invoiced for the withdrawal liability, ICP had paid all costs related to the drivers. (Stmt ¶¶ 46-49, 58-59, 157-158).

Pursuant to ICP's directive, the truck drivers were members of Local 327 and Top was required to execute Collective Bargaining Agreements with Local 327. (Stmt ¶¶ 27-33, 39-42, 103-104). The Collective Bargaining Agreements required contributions to the Pension Fund on behalf of the drivers. (Stmt ¶¶ 27-33,148-149). ICP representatives may have been present during negotiations of the Collective Bargaining Agreements along with Top and Local 327 representatives. (Stmt ¶¶ 104-109). These negotiations usually occurred after ICP's negotiations with its other union employees and ICP representatives discussed acceptable terms of the drivers' negotiations with Top. (Stmt ¶¶ 106-107). ICP retained a copy of the Collective Bargaining Agreements and complied with the terms of the Collective Bargaining Agreements. (Stmt ¶¶ 91-92, 108-109, 119, 126-128).

ICP's facilities consisted of a manufacturing plant and a warehouse (or distribution center). (Stmt ¶¶ 64-69, 73-74). Prior to 2003, ICP employed over 2000 employees at the plant and warehouse who were represented by a union other than Local 327. (Stmt ¶ 70). Prior to 1996, ICP used drivers working on-site at the plant and the warehouse and over-the-road drivers employing a total of approximately 25 drivers. (Stmt ¶¶ 65-67, 71). Thereafter, ICP did not need over-the-road drivers and employed approximately 15-20

drivers working just on-site in Lewisburg. (Stmt ¶¶ 69, 72). ICP also had a dispatch office and a mechanics office (or truck shop) each of which were separate buildings from the plant and the warehouse. (Stmt ¶ 75). The dispatch office had offices for the transportation managers and supervisors. (Stmt ¶¶ 78-79). The mechanics office had the drivers' time clock, lockers, and break area. (Stmt ¶¶ 76-77).

The drivers were part of ICP's traffic department which including the private fleet operations. (Stmt ¶¶ 80, 84). ICP managers and supervisors were responsible for the private fleet operations. (Stmt ¶¶ 84-85). ICP usually operated two shifts with one supervisor, two dispatchers, and drivers working each shift. (Stmt ¶¶ 86-89). ICP determined how many drivers worked each shift and followed union seniority for bidding each shift and for overtime. (Stmt ¶¶ 90-92).

The dispatchers gave the drivers their operating instructions. (Stmt ¶ 93). A dispatcher received written instructions from a manager in either the plant or the warehouse and relayed the instructions to the drivers. (Stmt ¶¶ 94-95). The drivers were responsible for moving (or spotting) trailers into the doors (or bays) at the plant and the warehouse. (Stmt ¶¶ 96-100). The drivers were also responsible for moving trailers around the ICP premises and for spotting trailers from suppliers with materials at the plant for unloading and spotting empty customer trailers in the warehouse for loading. (Stmt ¶¶ 101-102).

ICP determined when and how many drivers to hire. (Stmt ¶ 110). When new drivers were needed, ICP contacted Local 327 directly or contacted Top to provide candidates. (Stmt ¶ 111). A candidate completed an application at ICP, ICP interviewed the candidate, and made the final decision whether to hire the candidate. (Stmt ¶¶ 112-114, 117-118). After a driver was hired, both ICP and Top maintained a file for the driver.

(Stmt ¶¶ 115, 138). Top performed any background checks for a candidate and forwarded this information to ICP. (Stmt ¶ 116). ICP determined whether there were layoffs of drivers and followed union seniority for layoffs and recalls. (Stmt ¶ 119).

ICP was responsible for the decision to fire drivers and could bar drivers from ICP premises. (Stmt ¶¶ 120-122). ICP investigated any potential disciplinary matters related to the drivers. (Stmt ¶¶ 123-124). If discipline was minor, ICP handled it and, if necessary, contacted Top. (Stmt ¶ 125). Any grievances were filed with ICP and grievance hearings were held with representatives from Top, ICP, and Local 327 and ICP and Top made a joint decision on the disciplinary action against the driver. (Stmt ¶ 126-128).

Drivers could not refuse ICP assignments and could not work for other companies. (Stmt ¶¶ 129). ICP was responsible for safety issues related to the drivers and held meetings with the drivers 2-3 times per year. (Stmt ¶¶ 133-135). The drivers contacted ICP supervisors if they had a problem such as an accident or injury. (Stmt ¶ 132). ICP kept injury reports for workers compensation issues. (Stmt ¶ 136). ICP kept all forms for the drivers in the dispatch office. (Stmt ¶ 137). ICP was responsible for initiating any drug test or driver physical. (Stmt ¶ 139-140).

ICP maintained the time sheets and hours worked for the drivers and forwarded this information to Top. (Stmt ¶¶ 50-52). ICP handled driver vacation and sick time. (Stmt ¶ 130). If ICP was shorthanded, ICP contacted Local 327 for a temporary driver. (Stmt ¶ 131). Top calculated the drivers' pay and made the appropriate payroll deductions and issue checks to the drivers. (Stmt ¶ 52). The checks were sent to ICP for distribution to the drivers. (Stmt ¶ 53). If there was a problem with a driver's paycheck, ICP handled it. (Stmt ¶ 54-55).

Top's main representative with ICP was Robert Hyman. (Stmt ¶ 60). Mr. Hyman lived in North Carolina and all other Top representatives were located in suburban Chicago, Illinois. (Stmt ¶¶ 13, 61). Mr. Hyman was not on-site at ICP to handle day-to-day matters and came to ICP only every few months. (Stmt ¶¶ 62-63). If there was a problem with the drivers, ICP handled it and if necessary contacted Mr. Hyman. (Stmt ¶ 63, 125, 132).

In November 2001, ICP informed Top that ICP was terminating the ICP Agreement effective February 2002. (Stmt ¶¶ 26, 150). The decision to terminate the ICP Agreement was due to ICP hiring a non-union company to perform the work. (Stmt ¶151). Top was given notice of the decision to terminate the ICP Agreement and was not given any opportunity to negotiate a better agreement. (Stmt ¶ 152). In February 2002, ICP terminated its agreement with Top and the drivers were laid off. (Stmt ¶153). Local 327 decided not to pursue negotiations directly with ICP with respect to the drivers due to the labor situation in the Nashville area and the other union employees at ICP. (Stmt ¶ 154).

On March 2, 2002, ICP and Top permanently ceased to have an obligation to contribute to the Pension Fund or permanently ceased all covered operations, thereby effecting a "complete withdrawal," as defined in Section 4203 of ERISA, 29 U.S.C. §1383. (Stmt ¶¶ 148-149, 155). As a result of this complete withdrawal, ICP and Top incurred withdrawal liability to the Pension Fund in the amount of $570,694.35 as determined under Section 4201(b) of ERISA, 29 U.S.C. §1381(b). (Stmt ¶ 156). Top sent ICP an invoice for the withdrawal liability and ICP did not and has not paid the withdrawal liability as invoiced by Top. (Stmt ¶¶ 157-158). By letter dated April 30, 2002, ICP received a notice and demand for payment of the withdrawal liability assessment issued by the Pension Fund in accordance with Sections 4202(2) and 4219(b)(1) of ERISA, 29 U.S.C. §§ 1382(2) and

1399(b)(1). (Stmt ¶ 159). By letters dated July 22, 2005 and November 3, 2005, ICP received a notice from the Pension Fund that its withdrawal liability payments were past due and which forewarned ICP of the consequences of its failure to pay such liability pursuant to Section 4219(c)(5)(A) of ERISA, 29 U.S.C. § 1399(c)(5)(A). (Stmt ¶ 161).

ICP denies that it has an obligation to pay the withdrawal liability. (Stmt ¶ 160). ICP and Top have not requested a review of the withdrawal liability pursuant to § 4219(b)(2)(A) of ERISA, 29 U.S.C. § 1399(b)(2)(A). (Stmt ¶ 162). ICP and Top did not timely initiate arbitration pursuant to Section 4221(a)(1) of ERISA, 29 U.S.C. § 1401(a)(1), consequently the amounts demanded by the Pension Fund are due and owing pursuant to Section 4221(b)(1) of ERISA, 29 U.S.C. § 1401(b)(1). (Stmt ¶ 163).

On July 2, 2003, a Default Judgment was entered against Top for the withdrawal liability in the United States District Court for the Northern District of Illinois entitled <u>Central States, Southeast and Southwest Areas Pension Fund, et al., v. Top Transportation Services, Inc.</u>, Case Number 03 C 2993 (the "Top Judgment"). (Stmt ¶ 35). On April 1, 2004 and March 23, 2005, judgments were entered against various other companies that were part of the controlled group with Top for the withdrawal liability in the United States District Court for the Northern District of Illinois entitled <u>Central States, Southeast and Southwest Areas Pension Fund, et al., v. The Meritas Group, LLC, et al.</u>, Case Number 03 C 8138 (the "Controlled Group Judgments"). (Stmt ¶¶ 36-37).

On February 18, 2005, Top executed an Assignment for the benefit of the Pension Fund with respect to the ICP Agreement ("Assignment"). (Stmt ¶¶ 38, 170). To date, the full amount of the Top Judgment and the Controlled Group Judgments remains due and owing to the Pension Fund. (Stmt ¶ 171).

## III. ARGUMENT

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. (Fed.R.Civ.P. Rule 56(c)) As discussed in detail below, there is no genuine issue of material fact that the Pension Fund is entitled to summary judgment against ICP.

### A. ICP is an Employer under ERISA and MPPAA

ICP is an employer of the drivers under ERISA and is liable for the withdrawal liability. The facts demonstrate that ICP was the actual employer of the drivers and Top was merely a payroll processing company performing certain payroll and administrative functions for ICP's drivers. (Stmt ¶¶ 14, 19-25, 39-57, 141-145). The parties' actual practices in this case went well beyond a normal leasing agreement as Top had almost no contact with the drivers. (Stmt ¶¶ 44, 56, 60-63, 141-145). Under these circumstances, ICP clearly was the employer of the drivers.

The legislative history of ERISA demonstrates that Congress intended to broaden the common-law definition of "employer" and the plain language of the statute is consistent with this intent and under this broadened definition, ICP is an employer under ERISA. Section 515 of ERISA provides a right to collect contributions that are due pursuant to an agreement or pursuant to the terms of a plan, however, the language of Section 515 of ERISA does not include a duty to contribute under labor law. <u>Laborers Health and Welfare Trust Fund For Northern California v. Advanced Lightweight Concrete</u>, 484 U.S. 534, 545-49, 108 S. Ct. 830, 834-36 (1988). In contrast to Section 515 of ERISA, under Section 4212 of ERISA the definition of an obligation to contribute for withdrawal liability purposes explicitly includes an obligation to contribute arising "as a result of a duty under applicable labor-management relations law." 29 U.S.C. § 1392(a). In fact, while holding that an

Section 515 of ERISA claim must be based on the terms of an agreement, The Supreme Court noted that the obligation to contribute for withdrawal liability is broader as "[t]hat term [obligation to contribute] is defined for the purposes of the withdrawal liability portion of the statute in language that <u>unambiguously includes both the employer's contractual obligations and any obligation imposed by the NLRA</u>." 484 U.S. at 545-46, 108 S. Ct. at 834 (emphasis added).

The Sixth Circuit has not addressed this legal issue. The Seventh and Eighth Circuits have addressed this legal issue (and as discussed below these Courts did not engage in the proper legal analysis). See <u>Transpersonnel v. Roadway</u>, 422 F.3d 456, 460 (7th Cir. 2005); and <u>Rheem v. Central States, Se. & Sw. Areas Pension Fund</u>, 63 F.3d 703, 707 (8th Cir. 1995)[5]. The facts of <u>Transpersonnel</u> are inapposite to the facts in this case but the Court's discussion of the facts in that case is supportive to the Pension Fund that ICP was the employer. As such, ICP is the employer and the contributions to the Pension Fund merely passed from ICP to Top to the Pension Fund. <u>Transpersonnel</u>, 422 F.3d at 460-61.

As summarized above, significant facts supporting the conclusion that ICP was the actual employer include: (1) ICP required Top to have a collective bargaining relationship with Local 327 (Stmt ¶¶ 27-33, 103-109); (2) ICP directed Top with respect to the terms and conditions of the Collective Bargaining Agreements (Stmt ¶¶ 27-33, 103-109); (3) ICP complied with the terms and conditions of the Collective Bargaining Agreements (Stmt ¶¶ 27-33, 108-109, 111, 119, 126-127, 130-131); (4) ICP maintained control over the day-to-day activities of the drivers (Stmt ¶¶ 43-44, 80, 84-102, 129-140); (5) ICP was responsible for determining and maintaining the drivers' hours and wages (Stmt ¶¶ 50-55, 130-131); and

---

[5] The facts in <u>Rheem</u> are similar to <u>Transpersonnel</u>.

F:\ ...
Case 3:07-cv-00383   Document 37-1   Filed 04/14/08   Page 10 of 20 PageID #: 122
10

(6) Top did not pay the costs until ICP paid Top (Stmt ¶¶ 50-57, 141-145). These are significant factual differences from Transpersonnel, which demonstrate that Top is clearly was "merely a conduit" through which ICP submitted contributions to the Pension Fund (for example, when ICP was late paying Top, Top may have incurred late fees and other penalties and passed these costs on to ICP (Stmt ¶¶ 50-57)).

The Seventh and Eighth Circuits have not discussed the fact that the definition of an obligation to contribute for withdrawal liability purposes under Section 4212 of ERISA, 29 U.S.C. § 1392, is broader than the definition of obligation to contribute for purposes of Section 515 of ERISA. Those case mistakenly relied on case that considered the issue of the definition of "employer" in the context of contribution delinquencies (which is distinct from withdrawal liability). In those cases, funds attempted to hold shareholders/officers liable for contribution delinquencies. Rejecting these attempts, the Courts found that employer status required a *contractual* obligation to pay. This is consistent with the fact that Section 515 of ERISA provides for a remedy for a *contractual* obligation under the terms of the plan or of a collective bargaining agreement.

Neither Transpersonnel nor Rheem discussed the broader definition of obligation to contribute for withdrawal liability purposes under 29 U.S.C. § 1392(a). These cases improperly imposed the more narrow requirement that the obligation to contribute be contractual as required by Section 515 of ERISA. However, these cases do not support the imposition of such a requirement with respect to withdrawal liability claims since the definition of obligation to contribute for withdrawal liability includes obligations arising under labor law as well. Thus, ICP may be liable for withdrawal liability even absent a contractual obligation if it had an obligation to contribute under labor law pursuant to 29 U.S.C. § 1392(a). As discussed below, the facts demonstrate that ICP and Top were joint employers

under labor law. Therefore, ICP had an obligation to contribute under labor law, and is liable for the withdrawal liability.

> **B.   ICP is liable for the withdrawal liability under ERISA and MPPAA as a joint employer of the drivers**

Assuming arguendo that ICP is not the actual employer of the drivers, ICP and Top were joint employers of the drivers because ICP exercised sufficient control over the drivers. ICP meaningfully affected matters relating to the employment relationship of the drivers, such as supervision of day-to-day activities, authority to hire, fire, and discipline, promulgation of work rules and assignments, and issuance of operating instructions. (Stmt ¶¶ 42-44, 84-140). N.L.R.B. v. Centra, Inc., 954 F.2d 366, 370 (6th Cir. 1994); and W.W. Grainger v. N.L.R.B., 860 F.2d 244, 247 (7th Cir. 1988).

Top established a co-employer (or joint employer) relationship with ICP. (Stmt ¶¶ 14, 39-57, 141-147). The ICP Agreement provided that ICP was responsible for scheduling, routing, and dispatching the drivers and determined the quantities of merchandise to be picked up and/or delivered. (Stmt ¶¶ 19-25, 84-102, 129-133). ICP's control over the drivers is analogous to the facts in Centra. D & S Leasing and Teamsters Local Union No. 964, 299 NLRB 658 (1990), aff'd, Centra, Inc., 954 F.2d 366 (6th Cir. 1994).

The record unequivocally demonstrates that the drivers had minimal contact with Top from the hiring of the drivers through the termination of their employment. ICP had authority to hire drivers and ICP could refuse to hire any driver that was not acceptable. (Stmt ¶¶ 110-118). Applicants completed the application at ICP and were interviewed by ICP. (Stmt ¶¶ 110-114). ICP could refuse to permit a driver access to their property and equipment, which effectively fired the driver. (Stmt ¶¶ 120-122). ICP affected the negotiations of the Collective Bargaining Agreements by advising Top what terms were acceptable and, thereafter, followed the terms of the Agreements with respect to the rights of the drivers.

(Stmt ¶¶ 103-109). ICP promulgated work rules and conditions of the drivers, including safety regulations and other rules. (Stmt ¶¶ 129-140). ICP issued work assignments for the drivers, including shift bidding, overtime, and maintained the records of the hours worked for each driver. (Stmt ¶¶ 50-51, 129-140). ICP supervised the day-to-day activities of the drivers through ICP managers, supervisors, and dispatchers. (Stmt ¶¶ 84-102). ICP was responsible handling driver problems, including discipline, and if a driver filed a grievance, then ICP, Top, and Local 327 jointly resolved the grievance. (Stmt ¶¶ 119-128, 132).

The National Labor Relations Board ("Board") has determined that a joint employer may be obligated to contribute to a fund under the NLRA even if the joint employer has not signed a collective bargaining agreement. In D & S Leasing, the Board's "make whole order" required D & S Leasing, as the joint employer, to pay contributions to the fund. D & S Leasing, 299 NLRB 658 (1990). In D & S Leasing, D & S and Centra were determined to be joint employers. D & S and Centra entered into an agreement under which D & S provided employees to Centra. In 1986, Centra terminated the agreement with D & S and hired its own employees to perform the work. The Board determined that Centra was a joint employer of the D & S employees and the Board concluded that Centra was required to bargain with the union over its decision to terminate its contract with D & S and the effects of that decision. The Board further ordered Centra to offer to rehire the D & S employees that were terminated and that these employees be made whole for any loss of earnings and other benefits. Centra, 299 NLRB 663. In subsequent proceedings, the Board determined that Centra was responsible to pay the funds contributions of approximately $1.2 million as part of the make whole order for the employees. Centra, 314 NLRB 814, 820 (1994). The Board discussed that the restoration of the status quo and the make whole order includes

the payment not only of back pay but reimbursement of contributions to welfare and pension funds existing under the collective bargaining agreement. Centra, 314 NLRB at 817.[6]

In sum, ICP was a joint employer and had an obligation to contribute to the Pension Fund under labor law. Therefore, under 29 U.S.C. §1392(a), ICP is liable for the withdrawal liability.

### C. ICP is required to indemnify Top for the withdrawal liability pursuant to the terms of the ICP Agreement

In addition to its liability as a joint employer, ICP is required to pay the withdrawal liability pursuant to the unambiguous terms of the ICP Agreement. Under basic principles of contract construction, the Court should read the ICP Agreement to give effect to all its provisions and render them consistent with each other. Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 115 S.Ct. 1212, 1219 (1995). During their 30 year relationship, ICP paid any and all costs under the ICP Agreement and ICP cannot now escape the withdrawal liability on the untenable theory that withdrawal liability is excluded by the ICP Agreement. (Stmt ¶¶ 26, 45-49, 58-59).

The ICP Agreement clearly stated that ICP paid Top for all actual costs. (Stmt ¶¶ 19-25). Moreover, while the ICP Agreement identified some of the actual costs, ICP paid numerous costs that were not specifically identified in the Agreement (for example, foul weather gear, equipment, driver background checks, drug testing, and drivers' licences). (Stmt ¶¶ 45-49). Even more significant, some costs were identified as Top's responsibility, yet these costs were also paid by ICP (for example, workers' compensation premiums and

---

[6] The Board's order was later remanded on other grounds. See Centra v. N.L.R.B., 110 F.3d 63 (6th Cir. 1997). However, the Sixth Circuit did not question the underlying principle of the Board's order requiring Centra, as the joint employer, to pay contributions to the funds.

the employer's share of state, federal, and social security, and medicare taxes). (Stmt ¶¶ 19-25, 45-49). As a result, there were no actual costs that ICP failed to pay regardless of whether the ICP Agreement explicitly identified the cost as an obligation of ICP. It is disingenuous for ICP to now claim that it is not obligated to pay withdrawal liability under the ICP Agreement.

Withdrawal liability is a statutory obligation imposed by Congress that is part of the obligation that arises from participation in an ERISA fund. See Connolly v. PBGC, 475 U.S. 211, 106 S.Ct. 1018 (1986); and Concrete Pipe and Products of California v. Construction Laborers Pension Trust, 508 U.S. 602, 113 S.Ct. 2264 (1993). Similar to other statutory obligations imposed by Congress, withdrawal liability obligations may not be defeated by private contractual provisions. Connolly, 106 S.Ct. at 222-224 and Concrete Pipe, 113 S.Ct. at 2289-90. Therefore, it is not necessary for the withdrawal liability obligation to be explicitly identified in the ICP Agreement to be binding upon ICP.[7] Simply put, under ERISA the obligation to make contributions to a fund cannot be divorced from the statutory obligation of withdrawal liability.

The parties do not dispute ICP had an obligation to pay contributions to the Pension Fund under the ICP Agreement. (Stmt ¶¶ 19-25, 45-49). There is also no dispute that withdrawal liability is a statutory obligation or cost related to participation in the Pension Fund. ICP only disputes whether it is required to pay this cost. ICP was aware of (and had not disputed prior to 2002) its obligation to pay withdrawal liability in the event a withdrawal

---

[7] The Supreme Court in Connolly used the examples of minimum wages, control prices, and creating causes of action, 106 S.Ct. at 223, in discussing explicit language in a contract that would be unavailing to the parties as against public policy. In this case, there is no specific language excluding withdrawal liability in the ICP Agreement, notwithstanding that such language would still run afoul of Connolly and Concrete Pipe.

was assessed. (Stmt ¶¶ 58-59). In 1995, ICP investigated whether it would incur a partial withdrawal liability when the warehouse was moved to Lewisburg and some drivers were laid off. (Stmt ¶¶ 58-59). Thereafter, ICP periodically requested and received a withdrawal liability estimate. (Stmt ¶¶ 58-59). Prior to 2002, Top representatives were under the impression from ICP that ICP recognized it was responsible for any withdrawal liability. (Stmt ¶¶ 58-59). Top's assumption was reasonable based upon the terms of the ICP Agreement and similar situations where the withdrawal liability was paid without qualm by a leasing employer. (Stmt ¶¶ 58-59, 147).

The ICP Agreement also provided that ICP would indemnify Top. (Stmt ¶¶ 19-25). In March 2005, Top executed an Assignment whereby Top assigned its rights under the ICP Agreement to the Pension Fund (hereinafter "Assignment"). (Stmt ¶¶ 26, 170). As such, the Pension Fund has stepped into the shoes of Top to collect the amount due under the ICP Agreement, including the withdrawal liability assessment.

The Pension Fund is entitled to payment of the withdrawal liability as if ICP had paid Top. See D.C. Transportation Services, Inc. v. Coca-Cola Bottling Company of Northern Ohio, 853 F.Supp. 1002 (N.D.Ohio 1994)[8]; Global Leasing v. Henkel Corporation, 744 F.Supp. 595 (D.N.J. 1990); and Vare v. Philadelphia Electric Co., 1994 WL 8144 (E.D.Pa. 1994) (copy attached as Exhibit 101). Transpersonnel is also supportive because the second count sought a declaratory judgment that the lease agreement required Roadway to indemnify Transpersonnel for withdrawal liability incurred by Transpersonnel. After the case was remanded, the District Court dismissed the indemnification claim without prejudice because the claim was not ripe because the withdrawal liability assessment was in

---

[8] The court's discussion on whether CCB is an "employer" under ERISA are not dispositive because there are significant factual differences and the court's legal analysis has the same flaws as the courts in other circuits as discussed above.

arbitration and was not yet decided. Otherwise, the court did not question Transpersonnel's right to seek indemnification. Transpersonnel, Inc., v. Roadway Express, Inc., 2004 WL 868565, *5 (N.D.Ill. 2004) (copy attached as Exhibit 102).

There was a leasing contract in D.C. Transportation between Commercial Drivers, as lessor, and CCB, as lessee, with the leased drivers subject to collective bargaining agreements requiring pension contributions. CCB's termination of the contract triggered withdrawal liability. Pursuant to the terms of the leasing contract, Commercial Drivers prevailed at commercial arbitration on the issue of whether CCB was contractually obligated to indemnify Commercial Drivers for the withdrawal liability. In prior state court proceedings, the arbitration award was vacated and remanded to the arbitrator because the arbitrator may have improperly relied upon a prior contract in making its award and these proceedings were still pending. However, the court confirmed and did not question the right of Commercial Drivers to seek indemnification under the contract. D.C. Transportation, 853 F.Supp. at 1002.

### D. ICP is liable for the withdrawal liability under the doctrine of equitable assignment and the Pension Fund was an intended third party beneficiary of the ICP Agreement

ICP is also liable to the Pension Fund for the withdrawal liability under the doctrine of equitable assignment and because the Pension Fund was an intended beneficiary of the Collective Bargaining Agreements. The doctrine of equitable assignment provides that when a party accepts the benefits of a contract that party is bound by equity to the terms of the contract. Hillard v. Guidant Corporation, 37 F.Supp.2d 379 (M.D.Penn. 1999); see also Adelman v. Centaur Corporation, 145 F.2d 573 (6th Cir. 1944). As a third party beneficiary, the beneficiary that derives the benefit of an agreement correspondingly incurs the burdens of the agreement. LaSalle v. International Brotherhood of Electrical Workers

Local No. 665, 336 F.Supp.2d 727, 730 (W.D.Mich 2004). Alternatively, the Pension Fund was a third party beneficiary of the ICP Agreement because ICP agreed to pay the contribution obligations to the Pension Fund. Sheet Metal Workers Local 44 v. Scranton Sheet Metal, 881 F.Supp. 955, 958 (M.D.Penn. 1994).

The Pension Fund may assert a common law cause of action under these theories of liability because these causes of action further the primary purpose of ERISA. Sheet Metal Workers Local 44, 881 F.Supp. at 958. The Pension Fund (as fiduciaries under ERISA) may step into the shoes of Top and assert a claim against ICP for ICP's failure to pay the withdrawal liability. Sheet Metal Workers Local 44, 881 F.Supp. at 957.

ICP (as a third party beneficiary under the Collective Bargaining Agreements) must accept the burdens along with the benefits of these Agreements. LaSalle, 336 F.Supp.2d at 730. Under the Collective Bargaining Agreements, ICP derived the benefits of a stable, experienced driver work force and labor peace.[9] Correspondingly, ICP is responsible for the burdens under the Collective Bargaining Agreements and ICP demonstrated its acceptance of these burdens by complying the terms of the Agreements, including union seniority, grievance and disciplinary matters, and paying contributions to the Pension Fund. Thus, ICP is also responsible for the burden of the withdrawal liability under the Collective Bargaining Agreements.

ICP is also liable to the Pension Fund under the doctrine of equitable assignment. Under this doctrine, the relationship and transactions between ICP and Top must be viewed as a whole, thus, the ICP Agreement and the Collective Bargaining Agreements cannot be separated. See Adelman, 145 F.2d at 575. The cumulative effect of the Collective

---

[9] In addition to the fact that ICP required Top to execute the Collective Bargaining Agreements and, during negotiations for new agreements, directed Top with respect the terms that were acceptable to ICP. (Stmt ¶¶ 103-109).

Bargaining Agreements and the ICP Agreement transferred responsibility for contributions to the Pension Fund from Top to ICP. ICP demonstrated an affirmative assignment of rights and acceptance of those rights by following the terms of the Collective Bargaining Agreements in relation to the drivers. Again, since ICP accepted the benefits related Collective Bargaining Agreements, ICP is bound in equity to the terms of the Collective Bargaining Agreements. Hillard, 37 F.Supp.2d at 381-82; Providence Gravure v. R.S. Feldman & Company, 1985 WL 2485, *3 (N.D.Ill. 1985) (copy attached as Exhibit 103); and Tyco Laboratories, Inc. v. DASI Industries, Inc., 1993 WL 356929, *9 (N.D.Ill. 1993) (copy attached as Exhibit 104).

As discussed above, ICP had control over the drivers and the drivers had minimal contact with Top under the ICP Agreement. ICP complied with the terms of the Collective Bargaining Agreements and if ICP is not required to pay the withdrawal liability, ICP will be unjustly enriched to the detriment of the Pension Fund because ICP will have obtained the benefits of the Collective Bargaining Agreements without having to pay the corresponding liability, in this case withdrawal liability.

### E. The Pension Fund Is Entitled To Interest, Liquidated Damages, And Attorney's Fees and Costs

In addition to the principal amount of its withdrawal liability assessment, the Pension Fund is entitled to recover interest, liquidated damages, and attorneys' fees and costs pursuant to Section 502(g)(2) of ERISA, 29 U.S.C. § 1132(g)(2). (Stmt ¶¶ 34, 167). In collection actions, delinquent withdrawal liability payments are treated as delinquent employer contributions and thus are enforceable under Title I of ERISA. 29 U.S.C. § 1451(b). (Stmt ¶ 166). Under Title I, when a plan obtains a judgment for delinquent contributions, the court shall award the plan the unpaid contributions, interest thereon, fees, costs, and the greater of an amount equal to the interest or liquidated damages in the

amount of 20% of the unpaid amounts. 29 U.S.C. § 1132(g)(2). (Stmt ¶¶ 34, 167-169).

The damages awarded under 29 U.S.C. § 1132(g)(2), made applicable to cases involving withdrawal liability pursuant to 29 U.S.C. § 1451(b), are mandatory. Central States, Se. & Sw. Areas Pension Fund v. Slotky, 956 F.2d 1369, 1377 (7th Cir. 1992). The liquidated damages awarded under MPPAA "are something that an employer must pay as a penalty for refusing to follow the statutory procedure for challenging assessments of withdrawal liability." Central States, Se. & Sw. Areas Pension Fund v. Lady Baltimore Foods, 960 F.2d 1339, 1347 (7th Cir. 1992). Consequently, the Pension Fund requests that the Court award it interest, liquidated damages, costs, and attorney's fees on the remaining withdrawal liability.

## IV. CONCLUSION

For the reasons discussed herein, the Pension Fund is entitled to summary judgment in its favor against ICP for the outstanding withdrawal liability in the amount of $558,499.35 plus interest, liquidated damages, and attorneys' fees and costs.

Respectfully submitted,

s/Anthony E. Napoli
Anthony E. Napoli
Attorney for Plaintiffs
Central States, Southeast and
Southwest Areas Pension Fund
9377 W. Higgins Road, 10th Floor
Rosemont, Illinois 60018-4938
(847) 518-9800, Ext. 3702
ARDC # 06210910
tnapoli@centralstatesfunds.org

s/R. Jan Jennings
R. Jan Jennings, BPR No. 1536
Branstetter, Stranch & Jennings, PLLC
  & Jennings, PLLC
227 Second Avenue North, 4th Floor
Nashville, TN 37201-1631
(615) 254-8801