# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND and HOWARD McDOUGALL, Trustee,** | ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **Case No. 3:07-cv-00383** |
| **INTERNATIONAL COMFORT PRODUCTS, LLC,** | ) ) ) | **Judge Trauger** |
| **Defendant.** | ) ) ) | |

## MEMORANDUM

Pending before the court are: (1) a Motion for Summary Judgment filed by the plaintiff[1] (Docket No. 88), to which the defendant has filed a response (Docket No. 98), and in support of which the plaintiff has filed a reply (Docket No. 101); and (2) a Motion for Summary Judgment filed by the defendant (Docket No. 91), to which the plaintiff has filed a response (Docket No. 94), and in support of which the defendant has filed a reply (Docket No. 101). For the reasons discussed below, both motions will be denied.

## FACTS

The Fund is a "multiemployer pension plan," as defined by the Employment Retirement

---

[1] The court will refer to the plaintiffs, Central States, Southeast and Southwest Areas Pension Fund and its trustee, Howard McDougall, collectively as the "Fund" or the "plaintiff."

Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*[2] *See* 29 U.S.C. § 1002(37).

The Multiemployer Pension Plan Amendments Act ("MPPAA"), 29 U.S.C. § 1381 *et seq.*,

provides that an employer that withdraws from a multiemployer pension plan incurs a certain

amount of withdrawal liability. The Fund has brought this suit against defendant International

Comfort Products, LLC ("ICP") to recover approximately $560,000 in unpaid withdrawal

liability. (Docket No. 8 at 9.)

During the relevant time period, ICP manufactured heating and cooling products at a

plant in Lewisburg, Tennessee.[3] In 1971, ICP entered into a contract with Top Transportation

Services, Inc. ("Top"), under which Top provided truck driving services to ICP; effectively, Top

leased truck drivers, who were employed by Top, to ICP.[4] Top, which was located in the

suburbs of Chicago, Illinois, also leased truck drivers to a number of other companies, although

by 2001 it had only one customer other than ICP.

ICP and Top had a "cost-plus" arrangement, meaning that ICP reimbursed Top for the

wages and benefits paid to the drivers. The 1971 contract provided that ICP would reimburse

_____

[2] Unless otherwise noted, the facts are drawn from the parties' statements of fact, responses thereto, and related exhibits (Docket Nos. 90, 93, 95, 97, 100, and 102). The court also draws upon the statement of facts in the court's previous Memorandum regarding the parties' motions for summary judgment. (Docket No. 54.) The court draws all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Brown v. United States*, 583 F.3d 916, 919 (6th Cir. 2009).

[3] In 1971, the entity that is now ICP was called Heil-Quaker Corp. The court will refer to ICP and its predecessor entities collectively as "ICP."

[4] Top also provided several mechanics to ICP to work on ICP's trucks. Although Top provided both truck drivers and mechanics to ICP, the court will use the term "drivers" when generally referring to the employees that Top provided.

Top for its cost of operations, plus a ten percent "operating margin." (Docket No. 40, Ex. 11 at 2.) The contract specified that Top's costs included "direct wages, salary payments, payroll taxes and necessary fringe benefits, insurance and administration applicable to the operations." (*Id.*) In 1992, ICP and Top signed a successor agreement that was substantially similar to the 1971 agreement. The 1992 agreement provided that ICP would pay Top a weekly $35 fee for each driver and, again, that ICP would reimburse Top for all of its costs. (Docket No. 37, Ex. 4 at 3.) The court will refer to the 1971 and 1992 agreements collectively as the "ICP-Top Agreement."

The ICP-Top Agreement stated that Top's drivers were "not the agent or agents or employee or employees of [ICP], but that [Top] is an independent contractor, and any agents and employees used by it in performing hereunder shall be deemed to be under its exclusive management and control."[5] (*Id.* at 4.) The agreement also prescribed certain responsibilities of each party: ICP was responsible for "establishing schedules, routing, . . . dispatch[ing] the drivers and equipment," and "determin[ing] the quantities of merchandise to be picked up and/or delivered," while Top was responsible for hiring drivers and handling "all labor relations and the negotiating of union contracts." (*Id.* at 2, 5.)

From 1971 to 1995, Top's drivers transported ICP's products from the Lewisburg plant to ICP's warehouse in LaVergne, Tennessee, which was approximately 60 miles away from the plant. Top's drivers also delivered products to ICP's customers throughout the country, although

---

[5] These quotes are taken from the 1992 agreement, but the 1971 agreement contained similar provisions.

that practice ended in the mid 1980s.  In 1995, ICP relocated its warehouse from LaVergne to Lewisburg, to a property located across the street from the manufacturing plant.  From that point forward, Top's drivers simply transported ICP's products from the plant to the warehouse, a distance of several hundred yards.

Top's drivers were represented by Local Union No. 327 of the International Brotherhood of Teamsters ("Local 327").  Top, but not ICP, signed a series of collective bargaining agreements and "participation" agreements with Local 327; Top and Local 327 renegotiated these agreements approximately every three years.  The court will refer to this series of agreements collectively as the "Top CBA."  The Top CBA required Top to make pension contributions to the Fund on behalf of the drivers.  Pursuant to the ICP-Top Agreement, Top then received reimbursement from ICP for these contributions.

In November 2001, ICP notified Top that it was terminating the ICP-Top Agreement.  By April 2002, the contract was terminated, and Top ceased operations.  This triggered withdrawal liability for Top under the MPPAA, which the Fund calculated to be approximately $570,000.  In 2003, the Fund secured a default judgment against Top in Illinois federal court, but by then Top was defunct and unable to pay.  Afterward, the Fund brought this suit, alleging that ICP is jointly liable for Top's withdrawal liability.

As described in detail later in this Memorandum, at this point in the litigation, the central issue is whether ICP and Top were sufficiently interrelated to constitute a "single employer"of the drivers.  Relevant to that issue is the extent of ICP's control and supervision of the drivers, which the parties dispute.  Accordingly, the court will examine the details of the drivers' day-to-

day operations.

ICP's Lewisburg manufacturing plant was 1,000,000-square-foot building located on a 100-acre property, with more than 20 bays for loading or unloading trailers. The warehouse, located across the street from the plant, was a 500,000-square-foot building located on a 40-acre property, with approximately 38 bays for loading and unloading trailers. The warehouse property housed two other buildings – a mechanics' building and a dispatchers' office – as well as a parking lot for trucks and trailers. Outside the dispatchers' office was a three-lane pneumatic tube system, similar to the systems used at banks' drive-through lanes.

Between 1995 and 2002, the drivers' sole task was to drive "spotting" trucks, which they used to move trailers between the manufacturing facility and the warehouse. The trucks were either owned by ICP or leased by ICP from a third party, and ICP provided any equipment that the drivers needed. Basically, ICP's plant employees loaded product onto trailers parked in the plant's bays, the drivers picked up the trailers and drove them across the street to the warehouse, and ICP's warehouse employees unloaded the product at the warehouse's bays. Because the trailers filled the width of the bays, the drivers had little contact with the ICP employees who were loading or unloading the trailers. The drivers stored empty trailers in the warehouse parking lot.

The scheduling of the trailer loads depended on ICP's production schedule, and ICP determined the number of drivers it needed for a given shift. Drivers were hired or laid off according to ICP's needs. Between 1995 and 2002, ICP used between 15 and 20 drivers, and it owned or leased approximately 11 trucks and 60 trailers. During that time period, ICP employed

approximately 2,000 employees at its warehouse and plant, none of whom was represented by Local 327.

At the beginning of their shifts, the drivers would clock in at the mechanics' building and would notify the dispatchers that they were available to move trailers. The mechanics' building contained lockers and a break area that the drivers used. The drivers received instructions from ICP's dispatchers regarding which trailers to move.[6] The dispatchers received directions, via a pneumatic tube system, from ICP's warehouse. The dispatchers did not usually assign specific trailers to specific drivers. Rather, the dispatchers simply called out over the radio to the drivers that a given trailer was ready at a given loading bay; whichever driver was ready to pick up the trailer would receive written instructions, apparently via the pneumatic tubes outside the dispatchers' office. ICP used a system of written instructions, called "pull tags," to ensure that drivers picked up the correct trailers. At the end of the day, drivers returned the pull tags to ICP.

During each pay period, ICP supervisors collected the drivers' time cards, totaled their hours, and forwarded the information to Top. (Docket No. 37, Ex. 43 at 72-73.) Top wrote the drivers' paychecks and placed them in sealed envelopes, but ICP distributed them to the drivers.

Effectively, the drivers worked exclusively at ICP. ICP did not bar the drivers from working at other work sites, but the drivers apparently worked full-time schedules at ICP, and they could not refuse the tasks that ICP assigned during their shifts. There is no evidence that the drivers rotated among the other companies that Top serviced.[7] In fact, Joe Malone, who was

---

[6] Before 1997, some of the dispatchers were employees of a Top corporate affiliate. After 1997, all of the dispatchers were ICP employees.

[7] It appears that none of Top's other customers was located in Tennessee.

ICP's Senior Director of Distribution and Transportation until 1994 or 1995, testified that he thought "most of the [drivers] always thought and looked at it as [they] work for [ICP]." (Docket No. 37, Ex. 42 at 31.)

Top's main representative with respect to the drivers and ICP was Robert Hyman. Top employed Hyman from 1981 to 1986, and it retained him as a consultant from 1986 to 2002. Hyman repeatedly negotiated the Top CBA on behalf of Top, and he led Top's supervision of the drivers. It is undisputed that Hyman, who lived in North Carolina, only visited ICP's work site every few months, generally to resolve issues related to hiring, firing, union grievances, or discipline of the drivers. Otherwise, Top had no supervisory personnel in Lewisburg.

Given this lack of on-site supervision by Top, ICP was necessarily responsible, to some extent, for supervision of the drivers' day-to-day operations. Malone testified that former ICP manager Charlie Warren had "daily contact . . . with all the drivers and mechanics" (Docket No. 37, Ex. 42 at 14), and Hyman, at his deposition, characterized Warren as "the on-site supervisor" (Docket No. 37, Ex. 41 at 151). Indeed, Douglas McKay, who has been the Materials Manager at ICP's Lewisburg plant since 1997, stated in an affidavit that "ICP supervisors were responsible for overseeing the movement of trailers at ICP facilities."[8] (Docket No. 48, Ex. 43 ¶ 17.)

According to Robert Rosseau, who purchased Top in 2000, ICP exercised a high level of

---

[8] McKay further stated that "ICP management was ultimately responsible for the . . . movement of products and materials on ICP property, while Top was specifically responsible for services in accomplishing the movement of trucks and trailers in and around ICP facilities." (Docket No. 97, Ex. 2 ¶ 30.)

control over the drivers.[9]  At his deposition, Rosseau testified that his preferred model of operation was a "co-employer relationship," where the "worksite employer [such as ICP] would govern the day-to-day operations . . ., would hire and fire, would implement disciplinary actions, do reviews of their employees, and set their compensation," and the "administrative employer" such as Top would "do the payroll . . . , provide the worksite employees with policies and procedures," and "administer [the] benefit program."  (Docket No. 37, Ex. 47 at 141-42.) Rosseau testified that, although this co-employer model was not consistent with the terms of the ICP-Top Agreement, it *was* consistent with the actual day-to-day operation between ICP and Top.  (*Id.* at 142-43 (agreeing that the ICP-Top Agreement "didn't conform with how things were operated").)  Although Rosseau purchased Top in 2000, he testified that Top's relationship with ICP did not substantially change after the acquisition.  (*Id.* at 50-51.)

Other evidence suggests that Top's and ICP's operations, with regard to the drivers, were interrelated to some degree.  On at least one workers' compensation form regarding a driver's injury, filed in 1997, ICP was listed as the driver's employer.  (Docket No. 90, Ex. 4 at 2.) Starting in 2000, the drivers' paychecks indicated that they were from both ICP and Top.  (*See* Docket No. 37, Ex. 35 at 2.)  Similarly, a December 2001 letter from Top to the drivers stated that the letter "serve[d] as written notification of termination of employment with Top Transportation *and International Comfort Products*."  (Docket No. 47, Ex. 1 at 2 (emphasis added).)  ICP denies that it authorized the latter two uses of ICP's name.

_____

[9] In 2000, Top was purchased by The Meritas Group LLC, of which Rousseau owned 50 percent (and, eventually, 100 percent).

In addition, ICP maintained personnel files regarding the drivers. It is undisputed that, throughout the ICP-Top relationship, ICP investigated any accidents involving the trucks driven by the drivers and that the drivers reported accidents directly to ICP. (Docket No. 37, Ex. 41 at 123 (testimony by Hyman that drivers would report accidents "to ICP" and that the ensuing investigations were "a joint type of procedure" between ICP and Top); *id.*, Ex. 43 at 99-100 (testimony by McKay that, if a driver had an accident, the driver would notify ICP personnel, who might then decide to contact Hyman).)

There is also evidence that ICP alone handled minor disciplinary issues regarding the drivers. At his deposition, Hyman testified that, although he was responsible for any "major" disciplinary issues, "ICP personnel, the managers, had the daily responsibility of [the drivers]. And any minor type of problem, they, in turn, handled it." (Docket No. 37, Ex. 41 at 37.) This contradicts a statement in McKay's affidavit that "ICP did not 'handle' minor discipline; if discipline involving Top drivers required employer attention, that was Top's responsibility." (Docket No. 97, Ex. 2 ¶ 43.)

It is clear that ICP also handled at least some matters regarding drivers' sick days and vacation. ICP concedes that drivers' vacations "required ICP's accommodation." (Docket No. 100 ¶ 464.) Moreover, McKay testified at his deposition that, if a driver needed to call in sick, the driver would notify ICP, and ICP would usually not notify Hyman.[10] (Docket No. 37, Ex. 43 at 48.) McKay stated that, if ICP needed an additional driver or two to fill in for a sick driver on

---

[10] Hyman testified, however, that Top's office scheduled and tracked vacation days and sick leave. (Docket No. 37, Ex. 46 at 138.)

a temporary basis, ICP would contact Local 327 directly, and the union would send over a temporary driver. (*Id.* at 50.) ICP would give the temporary driver a Top application to fill out, although McKay was unsure if ICP would subsequently contact Hyman or Top regarding the application. (*Id.* at 51.)

The extent of ICP's involvement in permanent driver hiring is disputed. Driver turnover was low, so new drivers were hired infrequently. Hiring and layoffs of drivers, however, were conducted according to ICP's production schedule and staffing needs.[11]

In his affidavit, McKay stated that "ICP had no interest in the particular individuals whom Top used for its ICP work as long as they were qualified and capable of doing the work." (Docket No. 97, Ex. 2 ¶ 6.) McKay also stated that ICP did not interview the drivers. (Docket No. 48, Ex. 43 ¶ 29.) Similarly, Hyman testified that he (Hyman) was responsible for hiring drivers. (Docket No. 37, Ex. 41 at 34.) But Hyman also testified that, on occasion, ICP did dictate which drivers Top should hire. (*Id.* at 45.) Hyman stated that sometimes ICP would "tell [him] who they had there that was available for work and would like for [him] to come down and interview that particular [person]." (*Id.* at 134.)

Other evidence suggests that ICP was intimately involved in the hiring process. First, Malone testified that, when ICP needed additional drivers, ICP would contact Hyman, who would then "ma[ke] the arrangements for X number of candidates to come through." (Docket No. 37, Ex. 42 at 29.) Malone testified that former ICP manager Charlie Warren "did the

---

[11] Hyman testified that, "in some cases," ICP directly notified drivers that they were being recalled from a layoff. (Docket No. 37, Ex. 41 at 90-91.)

interview and hired who he thought was the best qualified individual." (*Id.* at 29-30.) Second, Rosseau, Top's owner since 2000, testified that Top did not conduct interviews of drivers and that, "as far as the decision to hire, [Top was] not involved in that." (Docket No. 37, Ex. 47 at 113.) Third, Ned Perryman, a driver who was hired by Top in 1975, testified that he was interviewed by Charlie Warren and was hired that same day; Perryman stated that, "[a]t the time, [he] didn't know who Top was," and he "thought [he] was working for ICP." (Docket No. 37, Ex. 46 at 9.)

Although it appears that no driver was fired during the period of the ICP-Top Agreement, ICP concedes that it had "the prerogative" to bar particular drivers from its premises. (Docket No. 100 ¶ 445.) Hyman testified that, if ICP wanted to bar a particular driver, Hyman would "take him off." (Docket No. 37, Ex. 41 at 128; *see also id.*, Ex. 43 at 106 (McKay testimony that "[ICP] had trouble with one driver and Bob [Hyman] wasn't willing to fire him and my response was, Bob, I don't care. He's not allowed on our property any longer").) McKay stated in an affidavit that ICP "notified Top if a driver was not meeting his job responsibilities." (Docket No. 48, Ex. 43 ¶ 34.) In fact, ICP did bar one driver, Jerry Luttrell, although Hyman and the union eventually persuaded ICP to allow Luttrell to continue working under certain conditions.

The parties dispute the extent of training offered by ICP to the drivers. In his affidavit, McKay stated that ICP did not train the drivers, other than to familiarize them with the layout of ICP's facilities and with ICP's policies and procedures. (Docket No. 97, Ex. 2 ¶ 41.) Malone, however, testified that ICP held two or three "breakfasts" for the drivers each year. (Docket No. 37, Ex. 42 at 30.) Malone stated that, "in addition to serving breakfast and giving out the awards

[for safe driving], we tried to make it a training process.  One time we would bring somebody from the Public Service Commission in to talk to the drivers."  (*Id.*)  The drivers, the mechanics, the dispatchers, Hyman, and several ICP representatives attended the breakfasts.  (*Id.* at 31.)  At the breakfasts, ICP passed out hats and shirts with the ICP logo.  (*Id.*)  In an affidavit, McKay stated that Top, not ICP, hosted these safety meetings.  (Docket No. 48, Ex. 43 ¶ 36.)

The parties also dispute whether the drivers "filed" union grievances with ICP or merely "handed" grievances to an ICP employee, who would then pass it along to Hyman.  Regardless, it is undisputed that representatives from Local 327, Top, and ICP attended grievance hearings.

Finally, the parties dispute whether ICP had any influence on Top's negotiations with Local 327.  Every three years, negotiations took place between Hyman and Local 327's representative.  Hyman and McKay both testified that they discussed matters with each other before Top's 2001 negotiation, but those discussions were apparently limited to the terms that ICP was able to secure during its own union negotiations. They did not testify that ICP directed Top to secure any particular terms.  Rosseau, however, testified that his "understanding," based on conversations with previous Top owner Ed Wilkinson, was that ICP wanted Top to have a collective bargaining agreement with Local 327 and that, "if we want to keep [ICP as a] client, we have to keep it this way."  (Docket No. 37, Ex. 47 at 70-71.)  Similarly, Wilkinson testified that "Top had a contract with [Local 327] because ICP wanted it to.  That was part of our agreement."  (Docket No. 37, Ex. 50 at 76.)  He later clarified that he "[couldn't] say that [ICP] directed [Top] to do that," but that ICP "indirectly" asked Top to contract with the union.  (*Id.* at 119.)  Wilkinson testified that he "assume[d] that if [ICP] didn't like [the Top CBA] they would

have gotten rid of it a long time ago." (*Id.* at 124.)

The plaintiff filed this suit on April 10, 2007, alleging that ICP is liable for Top's unpaid withdrawal liability. The plaintiff initially pursued three theories: (1) that ICP is liable as an "employer" under the MPPAA; (2) that ICP is liable pursuant to the common law doctrine of equitable assignment; and (3) that ICP is liable pursuant to the ICP-Top Agreement. On the defendant's previous Motion for Summary Judgment, the court dismissed all of the plaintiff's claims (Docket No. 55), and the plaintiff appealed. The Sixth Circuit vacated this court's decision regarding whether ICP is an "employer" and remanded the case for further proceedings. *Cent. States, Se. & Sw. Areas Pension Fund v. Int'l Comfort Prods., LLC*, 585 F.3d 281 (6th Cir. 2009).

Thus, the only surviving claim is that ICP is liable for withdrawal liability under the MPPAA because it was the drivers' "employer." Both the plaintiff and the defendant have filed Motions for Summary Judgment, pursuant to Federal Rule of Civil Procedure 56, regarding this issue.

## ANALYSIS

### I. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) requires the court to grant a motion for summary judgment if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the

burden shifts to the plaintiff to provide evidence beyond the pleadings "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Conversely, a moving plaintiff must show that the defendant cannot raise a genuine issue of fact regarding any element of the relevant claims. In both instances, "[i]n evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374.

"'[T]he judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "the mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 249, 252. An issue of fact is "genuine" only if a reasonable jury could find for the party. *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## II.    Applicable Labor-Management Relations Law

The issue underlying both parties' motions is whether ICP was an "employer" of the truck drivers under the MPPAA; if it was not, it could not incur withdrawal liability.[12] As discussed below, to determine whether ICP was an "employer," the court must determine

---

[12] The MPPAA creates withdrawal liability for an "employer" that "withdraws from a multiemployer plan in a complete withdrawal or a partial withdrawal." 29 U.S.C. § 1381(a). A "complete withdrawal" occurs when an employer "permanently ceases to have an obligation to contribute under the plan." *Id.* § 1383(a)(1).

whether ICP had a duty, under applicable labor-management relations law, to contribute to the Fund.

Previously, the defendant filed a Motion for Summary Judgment that argued, in relevant part, that ICP was not an "employer" of the truck drivers. Because ICP was not a signatory to the Top CBA, the court, relying on case law from other circuits, granted the motion and dismissed the plaintiff's claims. (Docket No. 54 at 11-14.) The plaintiff appealed, and the Sixth Circuit vacated this court's decision. *Int'l Comfort*, 585 F.3d 281.

Drawing upon ERISA's general definition of "employer," the Sixth Circuit held that an "employer," for the purposes of the MPPAA, is "a person who is obligated to contribute to a plan either as a direct employer or in the interest of an employer of the plan's participants." *Id.* at 284 (quotation marks omitted). Other circuit courts have interpreted this to mean that the alleged employer must have been *contractually obligated* to contribute to the plan. *Id.* at 285-86 (discussing case law). The Sixth Circuit, however, looked to the MPPAA's broader statutory definition of "obligation to contribute," contained in 29 U.S.C. § 1392:

> (a) "Obligation to contribute" defined
>
> For purposes of this part, the term "obligation to contribute" means an obligation to contribute arising –
>
> (1) under one or more collective bargaining (or related) agreements, *or*
>
> (2) *as a result of a duty under applicable labor-management relations law*, but does not include an obligation to pay withdrawal liability under this section or to pay delinquent contributions.

*Int'l Comfort*, 585 F.3d at 286 (quoting 29 U.S.C. § 1392(a)).

Thus, the Sixth Circuit held that "an obligation to contribute to a plan may arise not only from a contract, but also from 'applicable labor-management relations law[.]'" *Id.* (alteration in original). The appellate court remanded the case to this court "for a determination whether ICP had an obligation to contribute to the Fund 'under applicable labor-management relations law[.]'" *Id.* at 287 (alteration in original).

As this court explained in its subsequent April 8, 2011 Memorandum, any obligation to contribute to the Fund was ultimately based on the Top CBA, because that document created the pension obligations in the first place.[13] Thus, the key issue is whether any aspect of labor-management relations law bound ICP to the terms of the Top CBA.[14] (Docket No. 84 at 5-6.) The court determined that the most relevant source of labor law is the Labor Management Relations Act of 1947 ("LMRA"), 29 U.S.C. § 141 *et seq.*, which amended and added to the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151 *et seq.* The LMRA allows unions to bring "[s]uits for violation of contracts between an employer and a [union]." 29 U.S.C. § 185(a). Under certain circumstances, courts may hold that a company is bound by the terms of a collective bargaining agreement that the company did not sign; specifically, courts may find that a non-signatory is bound to make pension contributions under the collective bargaining agreement. (Docket No. 84 at 6, 8-11.)

---

[13] Generally speaking, in the absence of an agreement, employers are not required to fund pension benefits for their employees. *See, e.g.*, *Pfahler v. Nat'l Latex Prods. Co.*, 517 F.3d 816, 833 (6th Cir. 2007) ("ERISA does not require an employer to fund a plan . . . .").

[14] In its April 8, 2011 decision, the court held that it has jurisdiction to determine whether ICP had an obligation to contribute to the Fund under labor-management relations law. (Docket No. 84.)

In its April 8, 2011 Memorandum, the court alerted the parties to an on-point Sixth Circuit case, *Metropolitan Detroit Bricklayers District Council v. J. E. Hoetger & Co.*, 672 F.2d 580 (6th Cir. 1982), which the court proceeded to discuss at length. (Docket No. 84 at 9-11.) In *J.E. Hoetger*, employees of a subcontractor sued a contractor under the LMRA to recover unpaid fringe benefits, even though the contractor was not a party to the collective bargaining agreement that created the fringe benefit obligations. 672 F.2d at 581-82. The Sixth Circuit held that, when two companies constitute a single employer with regard to the relevant employees, both companies will be bound by a collective bargaining agreement signed by one of the companies. *Id.* at 583-84. The court stated that "[t]here are four factors which must be analyzed in determining whether two companies are [a single] employer[]: the interrelation of operations between the companies, common management, centralized control of labor relations, and common ownership."[15] *Id.* at 584 (citing *Radio & Television Broad. Technicians Local Union*

---

[15] The *J.E. Hoetger* opinion actually speaks in terms of "joint employers" and purports to apply a "joint employer" test, rather than a "single employer" test. Accordingly, in its April 8, 2011 Memorandum, this court also spoke in terms of a "joint employer" test.

As the plaintiff points out, however, the four-factor test used in *J.E. Hoetger*, which was derived from *Radio & Television Broadcast Technicians Local Union 1264 v. Broadcast Service of Mobile, Inc.*, 380 U.S. 255 (1965), is more accurately described as a "single employer" test. (Docket No. 94 at 5-6.) Indeed, in at least one subsequent case addressing the issue of whether a non-signatory should be bound by the terms of a collective bargaining agreement, the Sixth Circuit applied the same four-factor test as *J.E. Hoetger* but spoke in terms of whether the signatory and non-signatory companies constituted a "single employer." *Distillery, Wine & Allied Workers Int'l Union, Local Union No. 32 v. Nat'l Distillers & Chem. Corp.*, 894 F.2d 850, 851-52 (6th Cir. 1990).

The Sixth Circuit has since explained that the four-factor "single employer" test derived from *Broadcast Service* and the "joint employer" test derived from *Boire v. Greyhound Corp.*, 376 U.S. 473 (1964), are "analytically distinct." *Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 993 n.3-4 (6th Cir. 1997). In *Swallows*, the Sixth Circuit admitted that "the opinions of this circuit have not been entirely clear on the distinction between the concepts of

*1264 v. Broad. Serv. of Mobile, Inc.*, 380 U.S. 255, 256 (1965)).

Later Sixth Circuit cases have applied the same four-factor "single employer" test to determine whether a non-signatory to a collective bargaining agreement is bound by the terms of that agreement.[16] *Distillery, Wine & Allied Workers Int'l Union, Local Union No. 32 v. Nat'l Distillers & Chem. Corp.*, 894 F.2d 850, 851-53 (6th Cir. 1990) (determining whether an entity was "bound by the arbitration provisions of [a] collective bargaining agreement," even though it "was not explicitly named in the agreement"); *Int'l Longshoremen's Ass'n, Local Union No. 1937 v. Norfolk S. Corp.*, 927 F.2d 900, 902-03 (6th Cir. 1991) (determining whether, under the Railway Labor Act, a non-signatory "should be treated as though it were a party to the CBA"); *Laborers' Pension Trust Fund v. Standard Mach. & Equip. Co.*, No. 86-1552, 1988 U.S. App. LEXIS 15159, at *9-11 (6th Cir. Nov. 14, 1988) (determining whether a non-signatory was liable for pension contributions under a collective bargaining agreement); *see also Mich. State Painters Ins. Fund v. Ron Simmons Painting, Inc.*, 875 F. Supp. 417, 421 (E.D. Mich. 1995)

---

'joint' and 'single' employer." *Id.* at 993 n.4.

Thus, even though *J.E. Hoetger* and other cases applying the four-factor test speak in terms of "joint employers," in this Memorandum, the court will refer to the four-factor test as the "single employer" test.

[16] In *J.E. Hoetger*, the court stated in a footnote that, even if the non-signatory company and the signatory company constitute a single employer, "it may not necessarily follow, in the absence of [the non-signatory's] contractually undertaking liability under the collective bargaining agreement, that it would be liable to [the fund] for the fringe benefits provided by the agreement." *J.E. Hoetger*, 672 F.2d at 583 n.5. Subsequent Sixth Circuit cases have confirmed, however, that the existence of a "single employer" relationship between a signatory and a non-signatory, standing alone, is sufficient to bind the non-signatory to the terms of the collective bargaining agreement. *See Distillery, Wine & Allied Workers Int'l Union, Local Union No. 32 v. Nat'l Distillers & Chem. Corp.*, 894 F.2d 850, 851-53 (6th Cir. 1990); *Int'l Longshoremen's Ass'n, Local Union No. 1937 v. Norfolk S. Corp.*, 927 F.2d 900, 902-03 (6th Cir. 1991).

(determining "whether two companies can be considered a [single] employer for purposes of liability under ERISA and a collective bargaining agreement"); *S. Elec. Health Fund v. Kelley*, 308 F. Supp. 2d 847, 867 (M.D. Tenn. 2003) (same), *aff'd sub nom. S. Elec. Health Fund v. Heritage Mut. Ins. Co.*, 147 Fed. Appx. 497, 506 (6th Cir. 2005). The court's research has revealed that the Sixth Circuit's approach is consistent with cases from other circuits that hold that a non-signatory may be bound by a collective bargaining agreement if the four-factor "single employer" test is met.[17] *E.g.*, *Lihli Fashions Corp. v. NLRB*, 80 F.3d 743, 747 (2d Cir. 1996); *UA Local 343 of the United Ass'n of Journeymen & Apprentices of the Plumbing & Pipefitting Indus. v. Nor-Cal Plumbing, Inc.*, 48 F.3d 1465, 1471 (9th Cir. 1995); *Trs. of Pension, Welfare & Vacation Fringe Benefit Funds of IBEW Local 701 v. Favia Elec. Co.*, 995 F.2d 785, 788 (7th Cir. 1993); *Trs. of Nat'l Automatic Sprinkler Indus. Pension Fund v. Zengel Bros.*, 911 F.2d 725 (4th Cir. 1990); *Carpenters Local Union No. 1846 of the United Bhd. of Carpenters and Joiners of Am., AFL-CIO v. Pratt-Farnsworth, Inc.*, 690 F.2d 489, 504-05 (5th Cir. 1982).[18]

---

[17] Alternatively, a non-signatory may be bound by the terms of a collective bargaining agreement if it is the "alter ego" of a signatory. *E.g.*, *NLRB v. Crossroads Elec., Inc.*, 178 Fed. Appx. 528, 533 (6th Cir. 2006); *Lihli Fashions*, 80 F.3d at 748; *Favia Elec.*, 995 F.2d at 788. Although the "alter ego" test is similar to the four-factor "single employer" test – in fact, at least one Sixth Circuit case seems to effectively equate the two, *Standard Mach.*, 1988 U.S. App. LEXIS 15159, at *7-8, *10 – the "alter ego" test is more stringent. *See, e.g.*, *Crossroads Elec.* (requiring "a disguised continuance of the old employer"); *Lihli Fashions*, 80 F.3d at 748 (requiring "an attempt to avoid the obligations of a collective bargaining agreement through a sham transaction or technical change in operations"). Regardless, here, the plaintiff does not contend that ICP and Top were alter egos.

[18] To bind a non-signatory to a collective bargaining agreement, some circuits require that, in addition to meeting the "single employer" test, the plaintiff must show that the employees of the signatory and non-signatory companies constitute a single bargaining unit. *E.g.*, *Nor-Cal Plumbing*, 48 F.3d at 1470 (holding that the NLRB must make the bargaining unit determination); *Pratt-Farnsworth*, 690 F.2d at 505 (holding that the district court may make the

Despite the court's previous finding that the four-factor test enunciated in *J.E. Hoetger* is applicable to this case, the plaintiff's brief in support of its Motion for Summary Judgment ignores that test. (*See* Docket No. 89 at 10-19.) Even more baffling, the plaintiff's response brief criticizes the defendant for relying on *J.E. Hoetger*. (Docket No. 94 at 7-9.)

Instead of discussing *J.E. Hoetger*'s four-factor test, the plaintiff contends that the defendant was an "employer" under the MPPAA because it was the "actual employer" or the

---

bargaining unit determination). The requirement of a single bargaining unit makes sense when a plaintiff is attempting to require a non-signatory company to apply the terms of the collective bargaining agreement to the company's non-union employees. *E.g.*, *South Prairie Constr. Co. v. Int'l Union of Operating Engineers*, 425 U.S. 800, 801 (1976); *NLRB v. Don Burgess Constr. Corp.*, 596 F.2d 378, 381 (9th Cir. 1979). Indeed, "the primary motivation . . . in making an independent unit determination in a single employer case is to protect the rights under section 7 of the NLRA of the employees of [the non-signatory company] to bargain collectively with representatives of their own choosing." *Pratt-Farnsworth*, 690 F.2d at 507 (citation omitted).

The bargaining unit requirement appears to be unnecessary, however, when the relief sought will not directly impact the other employees of the non-signatory company. Thus, if the plaintiff simply seeks pension contributions for union employees, a finding that the non-signatory company and the signatory company constitute a single employer – regardless of any bargaining unit determination – "is enough to hold them jointly and severally liable for each other's debts and obligations, including financial obligations under the collective bargaining agreement." *Lihli Fashions*, 80 F.3d at 748; *see also Standard Mach.*, 1988 U.S. App. LEXIS 15159, at *10-11 (in a case seeking pension contributions, finding "no need . . . to make any sort of bargaining unit determination" because the plaintiffs did not request that the collective bargaining agreement be applied to the non-signatory's other employees); *Bhd. of Teamsters, Local No. 70 v. Cal. Consolidators, Inc.*, 693 F.2d 81, 83 n.2 (9th Cir. 1982) (noting that "[d]eciding whether [a non-signatory] should be held responsible for fringe benefits owed by [a signatory]" implicates "neither the appropriateness of a [bargaining] unit nor any other question of representation").

In any event, when deciding whether a non-signatory should be bound by the terms of a collective bargaining agreement, the Sixth Circuit has generally focused exclusively on the "single employer" test and has been silent regarding any bargaining unit determination. *Distillery, Wine & Allied Workers*, 894 F.2d at 851-53; *J.E. Hoetger*, 672 F.2d at 584; *Int'l Longshoremen's Ass'n*, 927 F.2d at 902-03. Thus, in the instant case, the court finds that it need not determine whether Top's truck drivers and ICP's other employees constitute a single bargaining unit.

"joint employer" of the truck drivers.  (*See* Docket No. 89 at 10-19.)  In arguing that the

defendant was the truck drivers' "actual employer," the plaintiff relies on cases addressing

employer-employee relationships in various areas of federal law.  *E.g.*, *Nationwide Mut. Ins. Co.*

*v. Darden*, 503 U.S. 318 (1992) (laying out a 12-factor test for determining whether, under

ERISA, a person is an "employee," as opposed to an independent contractor); *Peno Trucking,*

*Inc. v. Comm'r*, 296 Fed. Appx. 449 (6th Cir. 2008) (determining whether, for federal tax

purposes, truck drivers were a company's employees or independent contractors); *McClenton v.*

*Office Evolutions, Inc.*, No. 04-2889, 2006 U.S. Dist. LEXIS 19579 (W.D. Tenn. Mar. 1, 2006)

(determining whether a company was a plaintiff's employer for Title VII purposes).  Because

none of these cases addresses a company's duty to make pension contributions under a collective

bargaining agreement that the company did not sign, they are irrelevant.  Even if Top's drivers

were, for example, ICP's "employees" for federal tax purposes, it does not necessarily follow

that ICP faced an obligation to contribute to the Fund.

Similarly, the plaintiff relies on inapposite cases when arguing that ICP and Top were

"joint employers."  (Docket No. 89 at 18-19.)  Nearly all of the cases cited by the plaintiff

concern the application of § 8 of the NLRA, 29 U.S.C. § 158, which prohibits employers from

engaging in certain unfair labor practices.  *E.g.*, *D & S Leasing, Inc. v. Teamsters Local Union*

*No. 964*, 299 N.L.R.B. 658 (1990), *aff'd sub nom. NLRB v. Centra, Inc.*, 954 F.2d 366 (6th Cir.

1992)); *Carrier Corp. v. NLRB*, 768 F.2d 778 (6th Cir. 1985); *Dunkin' Donuts Mid-Atlantic*

*Distrib. Ctr., Inc. v. NLRB*, 363 F.3d 437 (D.C. Cir. 2004); *see also Grace v. USCAR*, 521 F.3d

655 (6th Cir. 2008) (discussing a joint employer's obligations under the Family Medical Leave

Act).  In its April 8, 2011 Memorandum, the court clearly explained that these cases are

inapposite because they "do *not* show that, absent conduct constituting an unfair labor practice, a

joint employer has any duty to comply with the terms of a collective bargaining agreement that it

did not sign."  (Docket No. 84 at 8.)  The plaintiff does not allege that ICP committed an unfair

labor practice.  Because these cases do not show that a non-signatory "joint employer" is liable

for pension fund contributions, the "joint employer" test used in these cases is irrelevant.[19]

In sum, to determine whether ICP was an "employer" because it had "a duty under

applicable labor-management relations law" to contribute to the plaintiff pension fund, the court

must examine whether ICP and Top constituted a "single employer."  In doing so, the court will

use the four-factor test recited in *J.E. Hoetger* and related cases, not the "joint employer" test

recited in *Centra* or *Carrier Corp.*[20]

---

[19] These cases use a "joint employer" test that is distinct from the four-factor test used in
*J.E. Hoetger*, although the tests do overlap somewhat.  In *Centra*, for example, the Sixth Circuit
stated that "whether a joint employer relationship exists depends upon 'such factors as the
supervision of the employees' day to day activities, authority to hire or fire employees,
promulgation of work rules and conditions of employment, work assignments, in issuance of
operating instructions.'"  954 F.2d at 370 n.2 (quoting *W.W. Grainger, Inc. v. NLRB*, 860 F.2d
244, 247 (7th Cir. 1988)).  Similarly, in *Carrier*, the court stated that the proper test is whether
"two or more employers exert significant control over the same employees – where from the
evidence it can be shown that they share or co-determine those matters governing essential terms
and conditions of employment."  768 F.2d at 781 (quoting *NLRB v. Browning-Ferris Indus. of
Penn., Inc.*, 691 F.2d 1117, 1124 (3d Cir. 1982)).  Ultimately, both of these formulations are
derived from the Supreme Court's decision in *Boire v. Greyhound Corp.*, 376 U.S. 473 (1964).
*See W.W. Grainger*, 860 F.2d at 247; *Browning-Ferris*, 691 F.2d at 1123-24.

[20] In its April 8, 2011 Memorandum, the court cited *Leber v. Universal Music & Video
Distribution, Inc.*, 225 F. Supp. 2d 928 (S.D. Ill. 2002), in passing.  *Leber* applied the "single
employer" test in determining whether a non-signatory company was bound to a collective
bargaining agreement, *id.* at 944, but it also alternatively applied the "joint employer" test, *id.*
As described earlier in this Memorandum, however, case law reveals an overwhelming
consensus that the "single employer" test, not the "joint employer" test, applies when

**III.    Whether ICP and Top Constituted a "Single Employer"**

The defendant argues that ICP and Top did not constitute a "single employer" because their operations were sufficiently distinct.  (Docket No. 92 at 11-19.)  In response, the plaintiff argues that ICP's control over the truck drivers is enough to establish that ICP was the drivers' employer.  (Docket No. 94 at 9.)

To determine whether ICP and Top constituted a single employer, the court must consider four factors: (1) the interrelation of operations between the companies; (2) common management; (3) centralized control of labor relations; and (4) common ownership.  *J.E. Hoetger*, 672 F.2d at 584.  This determination "is essentially factual."  *Id.*

"Whether two entities will be considered a single employer depends on the circumstances of the case taken as a whole."  *Distillery, Wine & Allied Workers*, 894 F.2d at 852.  "None of

---

determining a non-signatory company's obligations under a collective bargaining agreement.

For the proposition that a non-signatory "joint employer" may be bound by a collective bargaining agreement, *Leber* relied on *Teamsters Local Unions Nos. 75 & 200 v. Barry Trucking, Inc.*, 176 F.3d 1004 (7th Cir. 1999).  In *Barry Trucking*, the Seventh Circuit addressed whether a non-signatory company should be bound by the arbitration clause of a collective bargaining agreement; in making its determination, the court used a five-factor "joint employer" test identical to that used by the Sixth Circuit in *Centra*.  *Id.* at 1008.  The court imported this test from an earlier Seventh Circuit case that dealt with unfair labor practices, not with the issue of when non-signatory companies should be bound by collective bargaining agreements.  *See id.* (citing *DiMucci Constr. Co. v. NLRB*, 24 F.3d 949, 952 (7th Cir. 1994)).  The *Barry Trucking* court did not, however, discuss *Favia Electric*, 995 F.2d 785, a Seventh Circuit case that used the four-factor "single employer" test to determine whether a non-signatory was bound to make pension contributions under a collective bargaining agreement.

It appears that the Seventh Circuit is alone in suggesting that a non-signatory company may be bound by a collective bargaining agreement if it is a mere "joint employer," as opposed to being part of a "single employer."  Indeed, no court outside of the Seventh Circuit (or its component districts) has cited *Barry Trucking*.  Because all of the on-point Sixth Circuit cases apply the four-factor "single employer" test, this court declines to follow *Leber* and *Barry Trucking* with regard to the "joint employer" issue.

[the four] factors is conclusive, and all four need not be met in every case. Nevertheless, control over labor relations is a central concern." *Swallows*, 128 F.3d at 994 (citation omitted). In analyzing a non-signatory's control over a signatory's labor relations, it is important to consider whether: (1) the non-signatory exercised day-to-day control over the signatory's relations with its employees; (2) the non-signatory made any hiring or firing decisions; or (3) the non-signatory supervised the performance of the work of the signatory's employees. *J.E. Hoetger*, 672 F.2d at 584-85; *Int'l Longshoreman's Ass'n*, 927 F.2d at 903.

Here, there is no evidence that ICP and Top had common management or common ownership. Nevertheless, there is substantial evidence that the companies' operations were interrelated, at least with regard to the drivers, and that ICP supervised the drivers and exercised day-to-day control over their activities. For example, the plaintiff has presented evidence that: (1) all of the drivers' work was conducted on ICP's premises, with ICP's equipment; (2) a Top supervisor was rarely on ICP's premises; (3) all of the drivers' work assignments came from ICP; (4) ICP notified Top if a driver was not meeting his responsibilities, which implies that ICP monitored the drivers' performance; (5) ICP investigated any accidents by the drivers; (6) ICP decided which drivers to hire and could effectively fire any particular driver; (7) ICP conducted safety-related training; (8) ICP directly handled minor discipline and sick days without notifying Top; (9) ICP distributed the drivers' paychecks; (10) ICP maintained personnel files on the drivers; and (11) ICP influenced Top's decision to use drivers represented by Local 327. Viewing this evidence in the light most favorable to the plaintiff, a reasonable juror could find that ICP's supervision and control of the drivers was sufficient to create a "single employer"

relationship between ICP and Top.[21]

This conclusion is supported by *Industrial Personnel Corp. v. NLRB*, 657 F.2d 226 (8th Cir. 1981), in which the Eighth Circuit applied the four-factor test to a scenario similar to the instant case.[22] In *Industrial Personnel*, a trucking company and a tire manufacturer entered into an agreement providing that the trucking company would "hire drivers and handle most labor relations," while the tire manufacturer would "oversee the day-to-day operations of informing the drivers of their destinations and routes." *Id.* at 227. Drivers were required to "call their location in to [the tire manufacturer] each day," and they sent logs to the tire manufacturer. *Id.* at 229. The tire manufacturer also issued an operating manual to the drivers and reserved the right to reject drivers that did not meet certain requirements. *Id.* The National Labor Relations Board found that this "significant functional interrelation" was enough to meet the four-factor "single employer" test, and the Eighth Circuit affirmed the Board's decision as being supported by substantial evidence. *Id.* at 229-30; *see also Pacemaker Driver Serv., Inc.*, 269 N.L.R.B. 971, 974 (1984) (finding that the four-factor test was met because of a company's "day-to-day control over [truck] drivers with respect to dispatching, collecting of logs, daily telephone contacts, location of equipment and scheduling of return loads.").[23]

_____

[21] The plaintiff makes much of the fact that Top was allegedly a "professional employer organization." (Docket No. 89 at 8-9.) Regardless of that designation, the proper inquiry is whether the relationship between ICP and Top met the four-factor "single employer" test.

[22] Although *Industrial Personnel* did not address whether a non-signatory could be bound by a collective bargaining agreement, the court did apply the same four-factor "single employer" test used in *J.E. Hoetger*.

[23] The National Labor Relations Board's decision in *Pacemaker* was affirmed by the Sixth Circuit in *Carrier Corp.* Although the Sixth Circuit analyzed the case under the *Boire-*

The defendant argues that *International Longshoremen's Association* compels a finding that ICP and Top were not a single employer. (Docket No. 92 at 11-13.) In that case, a company, N & W, owned a coal dock and contracted with a third party, Lower Lake, to operate the dock "as an independent management company." *Int'l Longshoremen's Ass'n*, 927 F.2d at 901. Lower Lake "was responsible for transferring coal from N & W's railroad cars to ships," and, as in the instant suit, N & W compensated Lower Lake on a cost-plus basis. *Id.* The Sixth Circuit found that the two companies were not a single employer, largely because "the operations of the two companies were [not] substantially interrelated beyond the extent necessary to the performance of their basic contractual duties." *Id.* at 903. The contract between the two companies provided that Lower Lake would "furnish all labor and supervisory forces" and that N & W would "[not] exercise any control whatever over the [dock] employees"; the court found this contractual language to be "not controlling, [but] persuasive evidence of the parties' intentions." *Id.* In addition, N & W had no control over Lower Lake's negotiations with the employees' union. *Id.*

Critically, however, in *International Longshoremen's Association*, "there was little, if any, evidence that . . . N & W was involved in the day-to-day operation of the dock." *Id.* Nor was there any evidence "that N & W had immediate supervision or control of the [dock] employees." *Id.* Here, in contrast, there is evidence that ICP was intimately involved in the day-to-day work of Top's truck drivers and that ICP supervised the drivers. This is sufficient to distinguish the result in *International Longshoremen's Association*.

---

derived "joint employer" test, *Carrier Corp.*, 768 F.2d at 781, the Board used the four-factor "single employer" test, *Pacemaker*, 269 N.L.R.B. at 973.

Nevertheless, summary judgment in favor of the plaintiff is not proper, because a reasonable juror, viewing the evidence in the light most favorable to the *defendant*, could conclude that ICP and Top did not constitute a single employer.  As mentioned above, two of the four factors in the "single employer" test – common ownership and common management between ICP and Top – are completely absent here.  Furthermore, there are numerous factual disputes regarding the extent of ICP's supervision and control of the drivers.  For example, the defendant has presented evidence that: (1) ICP did not interview drivers or decide which drivers to hire; (2) ICP did not conduct training for the drivers; (3) ICP did not handle any disciplinary matters regarding the drivers; (4) the drivers had little contact with ICP personnel, other than receiving pick-up and drop-off assignments; (5) ICP had no control over Top's union negotiations; and (6) the language of the ICP-Top contract provided that the drivers were not ICP's employees.

Because factual issues exist regarding ICP's supervision and control of the truck drivers, and because the determination of "single employer" status is essentially a factual issue, the court cannot grant summary judgment in favor of either party.  *See Mich. State Painters*, 875 F. Supp. at 422 ("The [single] employer analysis is a fact-intensive inquiry that cannot be resolved on summary judgment where both sides have presented contradictory evidence.").  Accordingly, both parties' motions will be denied.

## CONCLUSION

For the reasons discussed above, the court will deny both the plaintiff's and the defendant's Motions for Summary Judgment.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge